UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO.  8:11-cr-269-T-23AEP
                                                      8:16-cv-1563-T-23AEP
LUIS LOPEZ

_____/

# O R D E R

Lopez moves under 28 U.S.C. § 2255 (Doc. 13) to vacate and challenges the
validity of his convictions for (1) use of interstate commerce in the commission of a
murder-for-hire, (2) conspiracy to use interstate commerce in the commission of a
murder-for-hire, and (3) knowingly using and carrying a firearm in relation to a crime
of violence resulting in death, for which he is imprisoned for life under each
conviction.  The United States admits the motion's timeliness.  (Doc. 17 at 2)  The
amended motion to vacate lacks merit.

# BACKGROUND

The following summary of the facts is from the circuit court's decision on
direct appeal (Doc. 348 at 2–6):

> In 2005, Cristie Sehorne and Jerry Bottorff met at a swingers
> club named the "Pleasure Palace" in Tampa, Florida. Mrs.
> Sehorne, who later became Mrs. Bottorff, frequented the club
> with her then-husband, Thomas Lee Sehorne, to swap partners
> with other couples. Mrs. Sehorne became acquainted with
> Bottorff because he worked at the front desk of the club, and the
> two began a relationship. Mr. Sehorne, who often worked out

of town for weeks on a tugboat on the Great Lakes, was aware of their relationship. He even gave his permission to Bottorff.

Mrs. Sehorne and Bottorff continued to date, and Mrs. Sehorne eventually decided that she wanted to be with Bottorff exclusively. But Mrs. Sehorne depended on Mr. Sehorne financially, and Bottorff did not make enough money to support her and her two children. So Mrs. Sehorne and Bottorff hatched a scheme to murder Mr. Sehorne for $1 million in benefits from his life insurance policy. At first the two discussed the idea in jest, but the discussions later became serious.

Bottorff approached Michael Garcia, a friend of his from the Pleasure Palace, about murdering Mr. Sehorne. Garcia, a career criminal, was once a high-ranking officer in the Latin Kings gang. Garcia has prior convictions for distributing narcotics, possession of a firearm as a felon, possession of ammunition, burglary, grand theft, and possession of burglary tools. In total, Garcia has 15 federal convictions and 10 state convictions.

Garcia was often at the Pleasure Palace to sell drugs, and he became friends with Bottorff and Mrs. Sehorne. Eventually, Bottorff approached Garcia about "tak[ing] care" of Mr. Sehorne for him. Garcia replied that he could probably arrange something. He eventually agreed to find someone to murder Mr. Sehorne for $60,000, and Bottorff and Garcia met several times after that, sometimes with Mrs. Sehorne and sometimes without her. The couple frequently met with Garcia in his driveway to discuss their plans so that Garcia's family would not be privy to the conversations.

Garcia played the role of the "middle man," whose task was to find someone to commit the murder. There was conflicting testimony at trial as to whether Garcia ever planned to commit the murder himself, but it was undisputed that both Mrs. Sehorne and Bottorff eventually became aware that someone other than Garcia would commit the murder. Garcia planned with Mrs. Sehorne and Bottorff to have Mr. Sehorne murdered "whenever it was possible," but the conspirators never set a deadline.

Garcia eventually included Lopez, who he knew from the Latin Kings and with whom he had burgled a beauty shop in 2007, in the scheme to murder Mr. Sehorne. Lopez, also known as "Proof," was at Garcia's home one day when Mrs. Sehorne and Bottorff arrived to discuss murdering Mr. Sehorne.

Mrs. Sehorne and Bottorff remained in the front yard, and Lopez remained inside the house. When Lopez later asked about the couple, Garcia explained who they were and what they wanted, and Lopez then offered to commit the crime for $60,000.

Garcia and Lopez's first attempt to murder Mr. Sehorne failed. . . . Lopez held the gun, which was an 80-year-old .38 revolver owned by Garcia, and the same weapon that Lopez later used to commit the murder. But Mr. Sehorne never emerged from the house, and Garcia and Lopez fled when neighborhood dogs started barking.

In the early hours of June 7, 2007, Garcia and Lopez returned to the Sehornes' home, and Lopez murdered Mr. Sehorne. They knew from Mrs. Sehorne that Mr. Sehorne would be transporting a friend from the airport at night and that he would be home late. They left Garcia's house around midnight, and they carried the same .38 revolver that they had taken during the first murder attempt. When they arrived at the Sehornes' home, Garcia acted as the lookout and Lopez was "the trigger man." At Lopez's trial, Garcia testified that he hid behind a burn pile in the yard to keep watch for Mr. Sehorne's truck. For his part, Lopez hid under a van in the carport and waited for Mr. Sehorne to return home.

Garcia had never tested the revolver to see if it would shoot. He also knew nothing about Lopez's ability to shoot a gun. And Garcia knew not whether the ammunition in the gun would fire.

When Mr. Sehorne arrived around 1:15 or 1:30 a.m., he parked under the carport. He then left the truck and walked toward the house. Garcia testified at trial that he could not see what happened next, but he heard an unknown voice say, "Oh God, no," and heard two gunshots. Garcia and Lopez then ran back to the car, and Lopez drove them back to Garcia's garage, where they cut off the barrel of the revolver with bolt cutters in an attempt to render the gun unidentifiable. Later that night, after Lopez had returned home, Garcia drove to a nearby river and threw the gun and the shoes that the two men had worn into the water. He also disposed of the clothes that they had worn by dropping them in a nearby trash bin.

Garcia spoke with Lopez several times after the murder, and phone records established frequent calls between their phones

near the time of the murder. The records proved calls between the phones on June 6, 2007, at 11:28 p.m., and on June 7, 2007, at 12:36 a.m. and 12:44 a.m. The next call between the phones was at 3:12 a.m, and Garcia testified at Lopez's trial that Lopez had called him after returning home from the murder. He also spoke with Lopez on the phone several times over the next couple of days, but they never discussed the murder. Lopez later called Garcia to inform him that the newspaper had run a story about the murder. And Lopez discussed his payment with Garcia about a week after the murder, with several additional conversations on that topic.

About a year later, police officers arrested Garcia for crimes unrelated to the murder of Mr. Sehorne. Garcia cooperated with the police, and he informed them of his involvement in the murder of Mr. Sehorne, including where he had disposed of the murder weapon. He cooperated for roughly two years before he entered a plea agreement for Mr. Sehorne's murder. As part of his cooperation, he helped law enforcement gather enough evidence to arrest Mrs. Sehorne and Bottorff. He also informed law enforcement of Lopez's involvement in the murder.

In his initial motion to vacate Lopez asserted five claims of ineffective assistance of counsel. (Doc. 1) This action proceeds under the amended motion to vacate (Doc. 13), which omits four of the initial claims, re-asserts the first claim of ineffective assistance of counsel, and adds a claim asserting entitlement to relief under *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015). The United States' response (Doc. 17) addresses the only two claims in the amended motion to vacate. In his reply Lopez complains (Doc. 22 at 7–8) that the response fails to address two of the initial grounds. Lopez abandoned the two initial grounds when he omitted them from the amended motion to vacate. *See Gross v. White*, 340 F. App'x 527, 534 (11th Cir. 2009) (recognizing that, in a prisoner civil rights action, "specific claims

made against particular defendants in the original complaint are not preserved unless

they are also set forth in the amended complaint").

## INEFFECTIVE ASSISTANCE OF COUNSEL

Lopez claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (*quoting Rogers v. Zant*, 13 F.3d 384, 386

(11th Cir. 1994)). As *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998),

explains, *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective

assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent

prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the

defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When

applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its

two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Lopez must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691–92. To meet this burden, Lopez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

### Ground One:

On the Friday before the Monday commencement of trial, the United States disclosed to Lopez's trial counsel the discovery of the three jailhouse informants and their proposed testimony. Because of the late disclosure, the district court granted trial counsel's request for a three-week postponement of trial. Lopez alleges that trial counsel's "[f]ailure to adequately investigate and ascertain the legitimacy of a

jailhouse informant's assertion that the confidential informants' testimony being presented by the Government were perjurious and self-serving." (Doc. 13 at 5) The circuit court summarized the testimony of the three witnesses as follows (Doc. 348 at 8–9 in 11-cr-269) (brackets original):

> The United States called three jailhouse informants to testify against Lopez: Christopher Brown, Antonio Harris, and Marquis Bruce. Brown and Harris had both roomed with Lopez at the Pinellas County Jail, and Bruce knew Lopez from playing basketball together. Brown testified that Lopez told him about the murder of Mr. Sehorne and bragged about his specialty, "dome check[ing]"— that is, shooting victims in the head. Brown also testified that Lopez told him that he had committed the murder for a large sum of money that he never received and that he had used a .38 revolver. Harris testified to nearly identical details of the murder, but added that Lopez told him that he and Garcia had planned to split $100,000, and that the payment was to come from "a lady named [Mrs. Sehorne] and her boyfriend." Bruce testified that he had heard Lopez claim to specialize in "dome check[ing]," and that he had received $60,000 for his last "hit." Counsel for Lopez thoroughly cross-examined the informants and asked whether they would receive reduced sentences for testifying. He also asked two of the informants whether they had ever read any newspaper articles about Mr. Sehorne's murder.

In the amended motion to vacate Lopez alleges that, after the circuit court affirmed his conviction and sentence, "an affidavit of one the confidential informants has been received wherein the affiant acknowledged that his testimony was false and that he and the other informants conspired between themselves to present testimony against the Petitioner for the purpose [of] receiving the benefit of a Motion for Substantial Assistance." (Doc. 13 at 5) Because the affidavit was not attached, the district court ordered (Doc. 15) Lopez to supplement the amended motion to vacate by filing the relevant affidavit. Lopez filed no supplement. However, the United

States provides an affidavit that was sent to Lopez from a fourth detainee, Rodney Carter. Lopez forwarded the paper to his former trial counsel. (Doc. 17-1) Carter states, in relevant part, that two of the informants (Brown and Bruce) tried to recruit him to testify against Lopez based on information they would supply that was either received from newspapers or the result of an internet search or fabricated — not information based on Lopez's admissions. Lopez contends that trial counsel rendered ineffective assistance by not adequately investigating the three jailhouse informants who claimed that he admitted to the murder. In other words, according to Lopez, trial counsel should have more thoroughly investigated Carter and his statements.

During the three-week postponement of trial, former trial counsel investigated the claims of the three jailhouse informants, obtained documentary evidence of their housing assignments as compared to Lopez's housing, and acquired their criminal records. Trial counsel conducted a through cross-examination of the jailhouse informants. In the response the United States accurately compares trial counsel's cross-examination with Carter's representations (Doc. 17 at 7–8):

> It is clear from the trial record that defense counsel Farmer did, in fact, investigate and work to impeach the government's incarcerated witnesses. The allegations in Carter's affidavit more-or-less track Farmer's cross-examination of the witnesses. Doc. 299 at 224–36; 249–58; 267–79. Farmer admitted into evidence summary charts showing Pinellas County Jail Housing Histories, Citrus County Jail Housing Histories, and the TBO article from which he argued the information about the murder was derived. Def. Exhs. 27, 37 and 38; see also Doc. 211. In other words, the only thing Farmer did not do is somehow find Carter — who had not come forward — amongst

all of the incarcerated federal inmates and call him to the stand
to impeach Brown, Harris, and Bruce.

The thoroughness of trial counsel's cross-examination of the three jailhouse informants proves that counsel's performance was not deficient. The deficiency that Lopez finds with counsel's performance was not finding Carter. Lopez did not learn about Carter until after the appeal concluded.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Lopez cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful, as *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992), explains:

> The test has nothing to do with what the best lawyers would
> have done. Nor is the test even what most good lawyers would
> have done. We ask only whether some reasonable lawyer at the
> trial could have acted, in the circumstances, as defense counsel
> acted at trial . . . . We are not interested in grading lawyers'
> performances; we are interested in whether the adversarial
> process at trial, in fact, worked adequately.

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014), *cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015), describes the required extent of counsel's investigation:

> [W]e have explained that "no absolute duty exists to investigate
> particular facts or a certain line of defense." *Chandler*, 218 F.3d
> at 1317. "[C]ounsel has a duty to make *reasonable* investigations
> or make a *reasonable* decision that makes particular
> investigations unnecessary." *Strickland*, 466 U.S. at 691,

104 S. Ct. at 2066 (emphasis added). "[C]ounsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." *Chandler*, 218 F.3d at 1318. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538.

*Chandler v. United States*, 218 F.3d 1305, 1317, n.20 (11th Cir. 2000), cautions a reviewing court against using hindsight as a basis for finding deficient performance because of what counsel could have found if he had chosen a particular investigatory path:

[B]asing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight. The proper inquiry was articulated in *Rogers v. Zant*: "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." 13 F.3d 384, 388 (11th Cir. 1994).

Trial counsel's not discovering Carter was not deficient performance. Under *Strickland* Lopez must prove both deficient performance and prejudice. Because Lopez fails to prove deficient performance, an analysis of prejudice is unnecessary. *See Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

**Ground Two:**

Lopez, based on *Welch v. United States*, 136 S. Ct. 1257 (2016), asserts entitlement to the retroactive application of *Johnson v. United States*, 135 S. Ct. at 2563, which holds as unconstitutionally vague the residual clause of the Armed Career Criminal Act in 18 U.S.C. § 924(e) for defining " a crime of violence." Lopez was not sentenced under Section 924(e). Instead, Lopez serves a mandatory term of life imprisonment under 18 U.S.C. § 1958(a), which contains neither "a crime of violence" as an element nor a concomitant residual clause. *Johnson* is inapplicable.

Accordingly, the amended motion under Section 2255 to vacate the sentence (Doc. 13) is **DENIED**. The clerk must enter a judgment against Lopez, close this case, and enter a copy of this order in the criminal action.

## DENIAL OF BOTH
## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Lopez is not entitled to a certificate of appealability ("COA"). A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's denial of his motion to vacate. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Lopez must show that reasonable jurists would find

debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Lopez is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Lopez must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 29, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE